# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

CENTURY TEL OF MISSOURI, LLC, )
et al. )
     )
         Plaintiffs, )
     )   Case No. 08-4106-CV-C-NKL
         v. )
     )
MISSOURI PUBLIC SERVICE )
COMMISSION, et al., )
     )
         Defendants. )
     )
     )
SOCKET TELECOM, LLC, )
     )
         Plaintiff, )
     )
         v. )   Case No. 08-CV-4134-NKL
     )
MISSOURI PUBLIC SERVICE )
COMMISSION, et al., )
     )
         Defendants. )

# ORDER

This case is about the circumstances under which telecommunications companies must allow customers to retain their original telecommunications numbers when switching telecommunications carriers. Plaintiff Socket Telecom, LLC ("Socket"), as well as Plaintiffs CenturyTel of Missouri, LLC, d/b/a CenturyTel, and Spectra Communications Group, LLC, d/b/a CenturyTel (collectively "CenturyTel"), are telecommunications companies. They are disputing the extent to which CenturyTel wireline (as opposed to wireless) customers may

(1) switch to Socket wireline service, (2) move their geographic location, *and* (3) keep their original telecommunications numbers. Defendant Missouri Public Service Commission ("Commission") issued an order requiring CenturyTel to allow its customers to do so.

Socket and CenturyTel are now seeking judicial review of the Commission's order. Each is claiming that different parts of the Commission's order is incorrect. Before the Court are the motions for summary judgment of Socket [Doc. # 18], CenturyTel [Doc. # 16], and the Commission [Doc. # 30]. For the following reasons, the Court: denies Socket's motion without prejudice; dismisses Socket's action (Consolidated Case No. 2:08-CV-04134-NKL) without prejudice; denies CenturyTel's motion; and denies in part and grants in part the Commission's motion.

## I.    Background[1]

The issues in this case are governed by the Telecommunications Act of 1996, 47 U.S.C. §§ 251-61, ("the Act") as well as interconnection agreements between Socket and CenturyTel. The interconnection agreements in dispute were approved by the Commission in October 2006. It appears from the face of the interconnection agreements that they are set to expire in 2009.

This case turns on an understanding of various technical telecommunications terms. For purposes of this case, the term "portability" refers to the ability of telecommunications

---

[1]   The following facts are taken from the uncontroverted statements of fact submitted with the parties' motions. Each party states that there are no disputed issues of material fact. Where a party has not responded to a supported statement of material fact, the Court has deemed the fact admitted.  *See* L.R. 56.1.

customers to maintain their original telecommunications numbers when changing their telecommunication provider. When a telecommunication customer changes carriers, the original carrier must "port" the customer's original telecommunications number in order for the customer to keep that number while receiving service from the new carrier.

The Act and the telecommunications industry address various types of portability. "Number portability" is "the ability of users of telecommunications services to retain, *at the same location*, existing telecommunications numbers . . . *when switching from one telecommunications carrier to another*." 47 U.S.C. § 153(30) (emphasis added); 47 C.F.R. § 52.21(n) (same). All local exchange carriers have the "duty to provide, to the extent technically feasible, number portability in accordance with requirements prescribed by the [Federal Communications Commission ("FCC")]." 47 U.S.C. § 251(b)(2). "Number portability" is distinguishable from "location portability;" "location portability" is "the ability of users of telecommunications services to retain existing telecommunications numbers . . . *when moving from one physical location to another*." 21 C.F.R. § 52.21(l) (emphasis added).

"Rate centers" is a term that is central to the dispute between Socket and CenturyTel. Generally, a "'rate center' is a relatively small geographic area . . . that is used to determine whether a given call is local or toll." *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 32 (D.C. Cir. 2005) (citation omitted). "Usually a rate center corresponds to the group of customers (a subset of an area code) served by a given complement of telephone switching equipment." *In re StarNet, Inc.*, 355 F.3d 634, 638 (7th Cir.2004). The parties' interconnection

Case 2:08-cv-04106-NKL   Document 43   Filed 01/12/09   Page 3 of 24

agreements define "rate center" as "the specific geographic point and corresponding geographic area that are associated with one or more particular NPA-NXX Codes." "NPA-NXX" codes relate to particular digits in typical ten-digit telecommunications numbers: an NPA code is commonly known as an area code; NXX codes are the first three digits of a number following the NPA code.

"VNXX service"[2] allows customers located in one geographic location to receive calls at a number with an NPA-NXX code associated with a different geographic area. For example, where a telecommunications customer subscribes to VNXX, individuals could dial that customer at a number typically associated with a small town in central Missouri and reach the customer at a physical location two-hundred miles away in St. Louis.

The interconnection agreements contain various provisions relating to porting. As a preliminary matter, Article III ("General Provisions"), Section 25.0 of the agreements states, "The headings in this Agreement are inserted for convenience and identification only and shall not be considered in the interpretation of this Agreement." More specifically addressing porting, Article XII, Section 1.1 states, "CenturyTel and Socket shall provide to each other, on a reciprocal basis, Permanent Number Portability (PNP)[3] in accordance with requirements of the Act." Section 3.2.1states:

> The Parties agree that the industry has established local routing number (LRN) technology as the method by which permanent number portability (PNP) will be

---

[2] VNXX service is sometimes referred to as foreign exchange service.

[3] Article XII, Section 2.1.4 defines "Permanent Number Portability", or "PNP", as "a long-term method of providing Local Number Portability (LNP) using LRN."

4

provided in response to FCC Orders in FCC 95-116 (*i.e.*, First Report and Order and subsequent Orders issued as of the date this Agreement was executed). As such, the Parties agree to provide PNP via LRN to each other as required by such FCC Orders or industry agreed-upon practices.

This section is preceded by a heading which states: "Local Routing Number – Permanent Number Portability (LRN-PNP)."[4] Section 6.4 is simply a heading, "Porting of DID[5] Numbers". Section 6.4.4 (which appears subsequent to the Section 6.4 heading) states, "Industry guidelines shall be followed regarding all aspects of porting numbers from one network to another." Section 6.4.5 (which also appears subsequent to the Section 6.4 heading) states, "Each Party shall abide by the guidelines of the North American Numbering Council (NANC) and the associated industry guidelines for provisioning and implementation processes."

Socket has requested CenturyTel to port numbers so that customers could: change carriers from CenturyTel to Socket; obtain VNXX service from Socket; keep the customers' original telecommunications numbers; *and* change the customers' geographic locations. CenturyTel refused to fulfill Socket's porting request, claiming that it was not required to provide location portability.

---

[4] Article XII, Section 2.1.3 of the interconnection agreements defines "Local Routing Numbers" as a ten-digit number "assigned to the network switching elements for the routing of calls in the network."

[5] The parties agree that the instant case does not concern "DID" or "Direct-Inward-Dialing" numbers. As discussed later, however, Section 6.4.4 is relevant to determine the intent of the parties.

5

In March 2007, Socket filed a complaint with the Commission, seeking relief from CenturyTel's refusal to fulfill its porting requests. Socket asserted that both federal law and its interconnection agreements with CenturyTel require CenturyTel to port the numbers.

The Commission held evidentiary hearings in July 2007. On March 26, 2008, the Commission issued a Report and Order. In the Report and Order, the Commission held that Socket was requesting location portability, that the FCC has not mandated location portability, and, therefore, federal law does not require CenturyTel to fulfill Socket's porting requests. However, the Commission also held that Section 3.2.1 of the interconnection agreements (requiring porting according to industry agreed-upon practices) does require CenturyTel to fulfill the porting requests, because industry agreed-upon practices require such porting. Thus, the Report and Order requires CenturyTel to port the numbers as requested by Socket.

## A. Complaints

Both Socket and CenturyTel seek review of the Report and Order pursuant to 47 U.S.C. § 252(e)(6), as well as 28 U.S.C. §§ 1331, 1337, and 1367. *See generally* § 252(e)(6) (providing for federal court review of agency rulings concerning interconnection agreements). Socket asserts that the Commission misinterpreted §251(b)(2) of the Act and FCC rules and decisions in holding that federal law does not require CenturyTel to fulfill Socket's porting requests. Socket claims that it has been harmed – and will continue to be harmed, particularly after expiration of the interconnection agreements – through the loss of customers, goodwill and revenues, as well as the need to alter its network and methods of

operation. Socket seeks a declaration that the Commission's Report and Order is invalid with respect to CenturyTel's porting obligations under federal law.

CenturyTel asserts that the Commission incorrectly interpreted the terms of the interconnection agreements. CenturyTel seeks a declaration that the Report and Order is invalid with respect to CenturyTel's porting obligations under the interconnection agreements, and that the Report and Order's interpretation of the interconnection agreements violated the Act and FCC rules, regulations and decisions.

## II.    Discussion

All parties, including the Commission, have filed motions for summary judgment. "Summary judgment is proper where there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law." *UnitedHealth Group, Inc.* — F.3d —, No. 08-1904, 2008 WL 5047669, at *2 (8th Cir. Dec. 1, 2008). Because the facts are undisputed, and the issues are purely legal questions of contract interpretation and statutory construction, resolution of the issues by summary judgment is appropriate.

### A.    Standard of Review

#### 1.    Commission's Interpretation of Federal Law

The Court reviews the Commission's "interpretation and application of federal law de novo and will set aside its findings of fact only if they are arbitrary and capricious." *Southwestern Bell Tel., L.P. v. Missouri Pub. Serv. Comm'n*, 530 F.3d 676 , 682 (8th Cir. 2008) (citing *WWC License, L.L.C. v. Boyle*, 459 F.3d 880, 889-90 (8th Cir. 2006)). The

7

ultimate issue raised by Socket – whether the Act requires Socket's requested porting – turns on federal law; accordingly, the Court will consider that issue de novo.

## 2. Commission's Interpretation of the Interconnection Agreements

The ultimate issue raised by CenturyTel – whether the interconnection agreements require the porting requested by Socket – turns on state contract law. *See Connect Commc'ns Corp. v. Southwestern Bell Tel., L. P.*, 467 F.3d 703, 708 (8th Cir. 2006). While the Commission's findings of fact related to state law issues are subject to arbitrary and capricious review, it has not been decided whether the same standard applies to the Commission's conclusions concerning state law. *Id.*

Without resolving the question, the Eighth Circuit in *Connect* noted that several circuit courts which have addressed the issue determined that federal courts should review state commission determinations of state law with "deference to the state agency's expertise in making state law determinations." *Id.* (citing *"Global NAPs, Inc. v. Verizon New Eng., Inc.*, 454 F.3d 91, 96 (2d Cir. 2006) ('[W]e review the Board's decisions as congruent with state law under the arbitrary-and-capricious standard.'); *Southwestern Bell Tel. Co. v. Public Utility Comm'n of Texas,* 208 F.3d 475, 482 (5th Cir. 2000) (reviewing the state agency's 'state law determinations ... under the more deferential arbitrary-and-capricious standard'); *Michigan Bell Tel. Co. v. MFS Intelenet of Mich., Inc.*, 339 F.3d 428, 433 (6th Cir.2003) (noting 'the inherent logic of ... allowing state agencies wider deference in state law determinations'); *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir.1999) ('[We] consider[ ] all other issues under an arbitrary and capricious standard');

8

*Southwestern Bell Tel. Co. v. Brooks Fiber Commc'ns of Oklahoma, Inc.*, 235 F.3d 493, 498 (10th Cir. 2000) (reviewing all state law determinations made by a state agency under arbitrary and capricious standard)").

The Court finds persuasive the reasoning of these cases in the context of this dispute where the intent of the parties relates to technical issues and industry practices. Therefore, the Court will review the Commission's interpretation of the interconnection agreements under the arbitrary and capricious standard.[6]

### B. Federal Law

Socket challenges the holding of the Commission that the Telecommunications Act of 1996 does not require CenturyTel to fulfill Socket's porting request. Specifically, Socket argues that CenturyTel must port numbers so that its customers can: change carriers to Socket; obtain VNXX service from Socket; keep the customer's original numbers ; and change the customers' geographic locations. The parties agree that the Act requires number porting and does not require location porting. However, Socket argues that what it is requesting amounts to number porting and not location porting. Though the Commission held that the interconnection agreement required porting as requested by Socket, it also held that Socket is requesting location porting, which is not required by the Act. It is this interpretation of the Act by the Commission which Socket seeks to reverse.

### 1. Standing

---

[6] As discussed later, the Court would reach the same conclusion regardless of the standard of review.

Case 2:08-cv-04106-NKL   Document 43   Filed 01/12/09   Page 9 of 24

CenturyTel first argues that Socket lacks standing to appeal the Commission's interpretation of the Act. It contends that since the Commission ordered CenturyTel to port the requested numbers based on the interconnection agreement, Socket has achieved the remedy it requested and therefore is not an aggrieved party entitled to judicial review.

While the general rule is that a party may not appeal from a decree in its favor, an exception exists for cross-appellants who may become aggrieved upon reversal of the direct appeal. *See Port of Seattle, Washington v. Federal Energy Reg. Comm'n*, 499 F.3d 1016, 1028 (9th Cir. 2007). Because Socket may become aggrieved if CenturyTel achieves what it requests on appeal, the Court concludes that Socket has standing to appeal the Commission's interpretation of the Act.

### 2.    Does Federal Law Require Portability as Requested by Socket?

Whether CenturyTel is required to fulfill Socket's porting request under the Act depends on whether Socket is requesting "number portability" or "location portability." Socket argues that, because the phone numbers for which porting has been requested would remain at the same rate center, it is requesting only number portability not location portability. In other words, when Socket's new customer is called, even if the customer is in a different geographic area, the call will go through the customer's old rate center. This is because the customer is also subscribing to Socket's VNXX service which provides the connection from the customer's new geographic location back to the customer's old rate center. Socket therefore contends that its request is no different than if the customer

remained in the same place and asked to switch from CenturyTel to Socket - i.e., number portability which is required by the Act.

Again, 47 U.S.C. § 153(30) and 47 C.F.R. 52.21(n) define number portability as "the ability of users of telecommunications services to retain, *at the same location*, existing telecommunications numbers . . . when switching from one telecommunications carrier to another." *Id.* (emphasis added). 21 C.F.R. § 52.21(l) defines location portability as "the ability of users of telecommunications services to retain existing telecommunications numbers . . . *when moving from one physical location to another*." *Id.* (emphasis added).

### a.    FCC Statements

The FCC has not resolved the question raised by Socket – at least not in the context of porting between wireline carriers. Socket, however, emphasizes statements made by the FCC in other contexts that indicate that porting is "number portability" so long as numbers remain within the same rate center. For example, in *In the Matter of Telephone Number Portability*, FCC CC Docket No. 95-116, 18 F.C.C.R. 23697 (Nov. 10, 2003) ("Intermodal Order"), the FCC stated that it required wireline carriers to port numbers to wireless carriers consistent with industry standards so long as rate center assignment remained the same. *Id.* at ¶ 24.

Similarly, in *In the Matter of Telephone Number Portability*, FCC CC Docket 95-116, 22 F.C.C.R. 19531 (Nov. 8, 2007) ("Interconnected VOIP LNP Decision"), the FCC indicated that it required wireline carriers to port numbers to wireless carriers (and wireless carriers to port to wireline carriers) as long as the carriers to whom the numbers were ported

11

maintained the number's original rate center designation following the port.  *Id.* at ¶¶ 3, 8,

16.  In that order, the Commission stated that it had "rejected the argument that it imposed

a location portability duty on carriers because the number must retain its original rate center

designation, *i.e.*, the number remains at the same location despite the fact that a wireless

subscriber may travel outside a rate center and make calls without incurring toll charges."

*Id.* at n. 18.  Thus, according to Socket, the FCC has focused on rate centers as the relevant

"location" for determining number portability, suggesting that such location does not change

so long as the rate center of the number – rather than the physical location of the customer

– remains the same.  *See also U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29 (D.C. Cir. 2005)

(considering wireline to wireless portability, acknowledging that FCC indicated that numbers

do not change locations if they remain within the same rate center).  None of these cases,

however, dealt with wireline to wireline porting.

     In addition to focusing on FCC statements requiring porting where numbers remain

within the same rate center, Socket emphasizes the FCC's consistent focus in the porting

context on the need for customers to be able to choose their carriers, and the need to promote

competition generally.  *See, e.g.,*  Intermodal Order at ¶ 27; Interconnected VOIP LNP

Decision at ¶¶ 1, 5, 17, 19, 23, 26, 29-31.  Socket argues that these statements weigh in favor

of requiring CenturyTel to fulfill its port requests.

     In contrast, the Commission and CenturyTel emphasize seemingly contradictory

statements issued by the FCC with regard to the definition of "location" in the context  of

number porting.  For example, the Intermodal Order purposely did not address wireline to

12

wireline porting: it stated that "wireline carriers are not able to port a number to another wireline carrier if the rate center associated with the number does not match the rate center associated with the customer's physical location." Moreover, in the Intermodal Order, the FCC sought comment on whether wireless and wireline number should be treated differently "in this regard." Intermodal Order at ¶ 43. Thus, the FCC indicated that its comments regarding wireless carriers may not apply to wireline carriers.[7]

### b. Case Law

The sparse case law addressing whether number porting is mandated where a number, as opposed to a customer, stays within the same rate center finds that the relevant FCC rules and orders are ambiguous. *See U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 34 (D.C. Cir. 2005); *Central Texas Tel. Coop. v. FCC*, 402 F.3d 205, 207 (D.C. Cir. 2005)*; In re Starnet, Inc.*, 355 F.3d 634 (7th Cir. 2004). In *Starnet*, the Seventh Circuit directly considered the meaning of the term "location" as it relates to number portability and location portability. *Id.* at 636-37. There, a bankruptcy court had interpreted the number portability statute, 47 C.F.R. § 153(30), and corresponding rule to require a wireline carrier to port numbers where the physical location of a customer's corporate headquarters remained the same, regardless

---

[7] The Commission and CenturyTel also argue that FCC orders responding to natural disasters indicate that porting may not be required even where rate centers remain the same. In *In the Matter of Telephone Number Portability Numbering Resources Optimization*, FCC CC Docket Nos. 95-116 (June 29, 2007) and 99-200 (Sept. 4, 2005), the FCC indicated that it was waiving its rules regarding portability when it allowed the "porting of telephone numbers geographically outside a rate center" during a period of disruption caused by the Hurricane Katrina and Greensburg, Kansas Tornado natural disasters.

13

of the location associated with the point at which calls would terminate.  *Id.* at 636.  The *Starnet* court rejected this interpretation of "number portability" as "implausible."  *Id.* at 637.

The *Starnet* court found that the word "location" could refer to the "customer's physical location, the end of the wire's physical location, or the rate center's physical location."  *Id.*  The *Starnet* court commented that the Intermodal Order implied, "though it [did] not quite say, that the FCC thinks of the rate center as the 'location' that matters."  *Id.* Still, the *Starnet* court recognized that the FCC has repeatedly treated wireless carriers differently than wireline carriers.  *Id.*  Thus, the *Starnet* court found there was room for interpreting the FCC's orders as indicating that rate centers were not the appropriate measure of location in the wireline setting.  *Id.*  The *Starnet* court concluded, "Only the FCC can disambiguate the word 'location'; all we could do would be to make an educated guess."  *Id.* at 638.

"Instead of trying to divine how the FCC would resolve the ambiguity created by the word 'location,'" the *Starnet* court referred the matter to the FCC under the doctrine of primary jurisdiction.  *Id.*  In so doing, the *StarNet* court clarified that it used the term "primary jurisdiction" in its weaker sense, meaning that a court may refer an issue to an agency with greater knowledge on that issue.  *Id.* ("The doctrine of primary jurisdiction allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight.") (citation and internal quotation omitted).  The *Starnet* court stated it was referring the matter to the FCC so that it could

14

"address the meaning of the word 'location' for purposes of wireline-to-wireline portability."

*Id.* at 640.[8]

### c.    Referral to the FCC Under the Doctrine of Primary Jurisdiction

As the *Starnet* court recognized, the meaning of the word location is appropriate for referral to the FCC under the doctrine of primary jurisdiction.  "The doctrine of primary jurisdiction applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (citations and internal quotation omitted).  "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Access Telcomms. v. Southwestern Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998).  While there is no set formula for invoking the doctrine of primary jurisdiction, courts must invoke it sparingly, given the potential for associated expense and delay;  however, referral may be appropriate where it would promote uniformity and consistency within a field of an agency's regulation and the agency has particular expertise on the matter. *Id.*

---

[8]  A review of the *Starnet* ECF docket reveals that the FCC did not reach the issue because of a technical error in the referral process.  *See* Case No. 03-2990 (7th Cir.), Letter from FCC Gen. Counsel to Clerk of Court (Nov. 5, 2004).

Applying these principles in the telecommunications context, primary jurisdiction referrals are appropriate where judicial resolution of a dispute would preempt the FCC from implementing policy decisions about programs and technical questions. *See Allnet Commc'n Serv., Inc. v. National Exchange Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120-21 (D.C. Cir. 1992) (dismissing tariff dispute between carriers under the doctrine of primary jurisdiction). The *Allnet* court determined that the Act permitted courts to withhold decisions in cases filed before them under the Act until the FCC has spoken on technical or policy questions that would determine the outcome. *Id.* at 1122.

In the instant case, the FCC has not spoken on the issue at hand – whether what Socket is requesting should be classified as "number portability" because the numbers remain within the same rate center or, instead, whether Socket is requesting "location portability." Congress has charged the FCC with regulating statutory requirements with regard to number portability. *U.S. Telecom*, 400 F.3d at 31 (citing 47 U.S.C. § 251(d)(1)). The number portability issue at hand is technical in nature, requiring considerations of technologies associated with wireline carriers and porting and the different considerations applicable to wireline and wireless carriers. As demonstrated by case law as well as prior FCC orders, the issue is not unique, its resolution will impact carriers nationwide, and resolution by this Court would at least in the context of this case interfere with the FCC's apparent intent to render its own related policy decisions. As such, the issue is appropriate for referral to the FCC.

"Referral of [an] issue to [an] administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be

16

unfairly disadvantaged, to dismiss the case without prejudice." *Reiter v. Cooper*, 507 U.S. 258, 269 (1993) (explaining that "referral" in this context describes the process by which a court stays or dismisses while the parties file an administrative complaint with the agency). The Court is unaware of any prejudice which would come to the parties from dismissal of Socket's challenge to the Report and Order without prejudice, and the parties articulated no objection to referral at oral argument. As such, the Court will deny Socket's motion for summary judgment and dismiss its claim – without prejudice – and refer the matter to the FCC. Socket is to petition the FCC directly. *See Access*, 137 F.3d at 609 (citing 47 U.S.C. § 208(a) (allowing complaints concerning "anything done . . . by any common carrier . . . in contravention of the provisions thereof" to be filed with the FCC)).

### B. Does the Interconnection Agreement Require Portability as Requested by Socket?[9]

CenturyTel challenges the Report and Order's holding that its interconnection agreements with Socket require it to fulfill Socket's port requests.

The parties agree that Missouri contract law governs interpretation of the interconnection agreements. *See Connect*, 467 F.3d at 708 (applying Missouri contract law to interpretation of interconnection agreement). Absent ambiguity, courts will enforce the plain meaning of contract terms. *See Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 349 (Mo.

---

[9] The Court does not refer the issue of whether the interconnection agreements require CenturyTel to fulfill Socket's port requests. *See generally Iowa Utilities Bd. v. F.C.C.*, 120 F.3d 753 (8th Cir. 1997) (holding that FCC did not have authority to review interconnection agreements), *rev'd in part*, *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 386 (1999) (finding that the issue of whether FCC's general authority to hear complaints arising under the Act was not ripe).

17

2006). Contracts are construed so as to give effect to all of their provisions. *See Massman Constr. Co. v. Kansas City*, 487 S.W.2d 470, 476 (Mo. 1972). When possible, "a contract must be construed so as to give effect to the intention of the parties as collected from the whole instrument." *Restaura, Inc. v. St. Louis Concessions, Inc.*, 52 F.3d 189 (8th Cir. 1995) (citations omitted). Here, all parties state that the plain language of the interconnection agreements sets forth the respective obligations of the parties, and none contend that the interconnection agreements are ambiguous.

### 1.    Commission Interpretation of the Interconnection Agreements

As a preliminary matter, the Commission in its Report and Order noted that the parties agreed to the relevant sections of the interconnection agreements, and that those sections were not imposed on the parties by arbitration. It further recognized that parties to an interconnection agreement are free to agree to services that are not required by the Act. It then concluded that even though the Act did not require CenturyTel to port the numbers requested by Socket, the interconnection agreements between the parties did. The Commission found that it was the industry norm to provide the kind of porting requested by Socket and the interconnection agreements required the parties to provide permanent number portability according to "industry agreed-upon practices".

The Commission emphasized Section 3.2.1 of the interconnection agreements, which states:

> The Parties agree that the industry has established local routing number (LRN) technology as the method by which permanent number portability (PNP) will be provided in response to FCC Orders in FCC 95-116 (*i.e.*, First Report and Order and

18

subsequent Orders issued as of the date this Agreement was executed). As such, the Parties agree to provide PNP via LRN to each other as required by such FCC Orders or industry agreed-upon practices.

The Commission rejected CenturyTel's argument that the "LRN" reference limited the scope of Section 3.2.1 to the technology of portability. Instead, the Commission found that all porting is LRN porting and that in Section 3.2.1 "the parties recognize that number portability (PNP) is supposed to be provided by the LRN method." (Report and Order at 16). The Commission went on to find that Section 3.2.1 has an independent clause which "states that the parties will provide . . . number portability . . . per FCC requirements and industry practices. " *Id.* Based primarily on that language, the Commission concluded that CenturyTel agreed to provide permanent number porting according to industry standards.

The Commission also considered other sections of the interconnection agreements which refer to industry guidelines in the context of porting. In particular it noted Section 6.4.4. ("Industry guidelines shall be followed regarding all aspects of porting numbers from one network to another") and Section 6.4.5 ("Each Party shall abide by the guidelines of the . . . NANC and the associated industry guidelines for provisioning and implementation processes."). The Commission acknowledged that Section 6.4.4 relates to DID numbers which were not the type of numbers being requested by Socket, but held that the parties agreement to port DID numbers reinforced the Commission's finding that Section 3.2.1 required permanent number portability.

After interpreting the interconnection agreements to require porting per industry guidelines, the Commission made a factual finding that it was the industry standard to

19

provide porting for a request such as had been made by Socket to CenturyTel.[10]  The

Commission concluded, "CenturyTel stands alone in its refusal to make such ports."

## 2. Discussion

CenturyTel posits that the Commission misread Section 3.2.1.  Again, Section 3.2.1

states:

> The parties agree that the industry has established local routing number (LRN) technology
> as the method by which permanent number portability (PNP) will be provided in response
> to FCC Orders....As such, the Parties agree to provide PNP via LRN to each other as
> required by such FCC Orders or industry agreed-upon practices.

According to CenturyTel, that section "requires the parties to provide PNP in accordance

with the Act, and to provide it via local routing number (LRN) technology as required by

FCC orders or 'industry agreed upon practices'."  (CenturyTel. Sugg. Supp. Mot. Summ. J.

at 16.)  CenturyTel reasons that LRN relates to the method of how a local number port is

completed and the "industry agreed-upon practices" clause refers to the "technical standards"

for use of LRN.  Thus, according to CenturyTel, Section 3.2.1 has nothing to do with

whether CenturyTel is obligated to fulfill Socket's porting requests.

---

[10]  The Commission considered testimony and other evidence.  It considered that other
companies had fulfilled similar port orders.  It considered testimony of witnesses concerning the
"closest thing to a definitive standards body that one might expect to find in the area of number
portability," the Local Number Portability Administration – Working Group ("LNPA-WG").
(Report and Order at 12.)  The Commission found that the LNPA-WG reached a consensus that
port orders should be filled when certain "caveats" are satisfied, and that Socket's Port Orders
satisfied the caveats.  The Commission determined that even CenturyTel's own witness
confirmed the Commission's findings.  CenturyTel does not take issue with the Commission's
findings regarding industry agreed-upon practices and guidelines, only with the Commission's
interpretation of the interconnection agreement language.

20

Instead, CenturyTel argues that only Section 1.1 defines CenturyTel's porting obligations. Section 1.1 states that the parties shall provide number portability in accordance with the requirements of the Telecommunications Act of 1996. CenturyTel claims that the parties would not say in one place that the Act controls their obligation to port numbers and then later say that industry agreed-upon practices control. According to CenturyTel this is particularly so because of the controversial nature of number portability. CenturyTel concludes that the only way to harmonize the two provisions is to read 3.2.1 as referring only to technology and 1.1 as defining the obligation of the parties to port. CenturyTel supports its conclusion by pointing to Section 3.1 of the Agreement which closely precedes 3.2.1. Section 3.1 states: "Each of the Party's End Office Switches is LRN-PNP capable." Because this section deals with technology, CenturyTel concludes that Section 3.2.1 also was intended to deal only with technology.[11]

There are several problems with CenturyTel's interpretation. First and foremost, the actual wording of Section 3.2.1 supports the Commission's interpretation. As previously stated, the Commission found that all porting in the industry is LRN porting. Where all porting is LRN porting, the first sentence of Section 3.2.1 states the obvious: the industry

_____

[11] CenturyTel's argument also relies on a heading, Section 3.0, titled "Local Routing Number – Permanent Number Portability (LRN-PNP)" for its argument that Section 3.2.1 should be limited to technological issues, as opposed to general porting issues. This argument ignores Article III, Section 25.0, which states, "The headings in this Agreement are inserted for convenience and identification only *and shall not be considered in the interpretation of this Agreement.*" (Emphasis added.) Even if the heading were relevant, it clearly indicates that 3.2.1 deals with two subjects - LRN and PNP. Such a reading is not inconsistent with the Commission's interpretation of 3.2.1.

Case 2:08-cv-04106-NKL   Document 43   Filed 01/12/09   Page 21 of 24

uses "LRN technology" to permanently port numbers. The second sentence then explains how and when the parties are to provide that porting: via "LRN" as required by FCC orders or industry agreed-upon practices. Since LRN is the only option in the industry for porting numbers, reading the second sentence to mean that LRN should be provided according to FCC orders or industry agreed-upon practices would be less logical. Furthermore, the first sentence of Section 3.2.1 uses the term "LRN technology", while the second sentence only uses the term "LRN." This further supports the Commission's conclusion that the second sentence refers to porting generally, rather than to LRN technology alone. A construction of a contract "that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003) (en banc). Therefore, the second sentence's reference to FCC orders and industry agreed-upon practices must refer to porting obligations, rather than to LRN technology.

The Court has considered that Section 1.1 states that the parties shall provide PNP in accordance with the requirements of the Act. Compliance with federal law is a minimum requirement because all telecommunication companies must comply with federal law. By later specifying that PNP shall be as required by the FCC or industry-agreed practices is not inconsistent with Section 1.1or illogical, particularly where there is an open question[12] of what the Act requires. These sections read together mean that the parties will comply with

---

[12]As previously discussed there is a debate between the parties about what the Act requires and even the FCC has been reluctant to resolve the issue.

the Act at a minimum but must comply with the more expansive requirements contained elsewhere in the interconnection agreements. This reading gives meaning to all sections as required by Missouri law.[13]

The fact that the parties in Section 6.4.4 agree that all aspects of porting shall be done by industry guidelines also supports the Commission's reading of Section 3.2.1 of the interconnection agreements. While Section 6.4.4 is specifically applicable to DID numbers which are not in dispute here; that section clearly indicates that the parties intended industry guidelines to apply to number portability even though they stated in Section 1.1 that the parties must comply with the Act. This clear statement in Section 6.4.4 gives substantial support to the Commission's interpretation that Section 3.2.1 also addresses the obligation of the parties to provide PNP.

The Commission's interpretation of the plain, broad terms of the sections it cited was not arbitrary and capricious.[14] The Commission reasonably interpreted the interconnection

_____

[13] While CenturyTel does not argue that Sections 1.1 and 3.2.1 conflict so as to render the interconnection agreements ambiguous, to the extent they do conflict, the more specific Section 3.2.1 would be read as controlling. *See A&L Holding Co. v. Souther Pac. Bank*, 34 S.W.3d 415, 418-19 (Mo. App. Ct. 2000) (stating that, under Missouri contract law, where a general provision is apparently contradicted by a more specific provision, the latter is held to control).

[14] While the Court gives deference to the Commission's interpretation of the interconnection agreements, the Court would reach the same conclusion even under a de novo standard of review. Further, though the Court agrees with the parties that the interconnection agreements are unambiguous, a contrary finding would require the Court to determine whether the Commission acted arbitrarily and capriciously in settling any ambiguity in favor of Socket. *See Connect*, 467 F.3d at 708-09 (deferring to findings of fact made on ambiguous contract). Considering the industry standards, the fact that CenturyTel stands alone in refusing to fulfill Socket's port requests, and the absence of evidence presented by the parties to the contrary, the Court would find that the Commission's finding that the parties intended for CenturyTel to

23

agreements as binding CenturyTel to follow industry agreed-upon practices and guidelines which call for fulfilling Socket's port requests.

## III.    Conclusion

Accordingly, it is hereby ORDERED that Socket's Motion for Summary Judgment [Doc. # 18] is DENIED without prejudice, and its action challenging the Report and Order (Consolidated Case No. 2:08-CV-04134-NKL) is DISMISSED without prejudice. It is further ORDERED that CenturyTel's Motion for Summary Judgment [Doc. #16] is DENIED. It is further ORDERED that the Commission's Motion for Summary Judgment [Doc. #30] is DENIED in part without prejudice (as to Socket's challenge on the federal law issue) and GRANTED in part (as to CenturyTel's challenge on the interpretation of the interconnection agreement).


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: January 12, 2009
Jefferson City, Missouri

---

follow industry standards in porting is not arbitrary and capricious.